

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

August 6, 1952

Hon. Robert S. Calvert
Comptroller of Public Accounts
Austin, Texas

Opinion No. V-1492

Re: Applicability of motor fuel
sales tax to purchases of
gasoline under Lease and
Operating Agreement be-
tween Reconstruction Fin-
ance Corporation and United
States Rubber Company.

Dear Sir:

We quote the following excerpt from your letter re-
questing our opinion on the above captioned matter.

"We desire the opinion of your office as to whether
or not motor fuel sold in Texas to the United States Rub-
ber Company under the conditions set out hereinbelow is
subject to the motor fuel tax imposed by Article 7065b,
Vernon's Annotated Civil Statutes of Texas.

"The United States Rubber Company has entered into
an agreement with the Reconstruction Finance Corpora-
tion acting by and through its Office of Rubber Reserve,
to lease, operate and maintain a systhetic rubber plant
located near Port Neches, Texas, said plant being owned
by R.F.C.'s agent, Rubber Reserve, and leased and oper-
ated by the United States Rubber Company under which
appears to us to be a cost-plus-a-fixed-fee contract.

"This department has construed the opinions ren-
dered by your office holding that private persons or
corporations engaged to perform cost-plus contracts
for the Federal Government are not subject to immunity
from the State tax imposed upon motor fuel purchased
and used by said contractors, to be applicable here, and
has notified the selling distributors that the taxes should
be collected. These opinions are No. 0-4389, dated May
28, 1942; No. 0-4689, dated July 21, 1942; No. 0-4731,
dated September 4, 1942; No. 0-5214, dated April 28, 1943;
and Opinion No. 0-5309A, dated March 13, 1944."

From your letter and the file attached thereto we have gathered the following facts.

Under the submitted contract, Reconstruction Finance Corporation (acting by and through its Office of Rubber Reserve), a corporation created by and existing under the laws of the United States (hereafter referred to as "Reserve"), entered into a lease and operating agreement with United States Rubber Company (hereafter referred to as "Operator").

Reserve owns a synthetic rubber plant near Port Neches, Texas. Reserve agreed to lease the plant to Operator, who agreed to use and properly maintain it for the manufacture of synthetic rubber. We will summarize only pertinent portions of the lengthy contract.

Operator is required to obtain satisfactory insurance, payable to or naming Reserve as assured, protecting against loss or damage to the Plant and against liability to third parties by reason of Operator's activities under the contract. Operator, after approval by Reserve, is to pay all taxes, assessments, and similar charges which may be imposed upon Operator or Reserve with respect to or upon the Plant or any part thereof.

In numerous sections of the contract (see, for example, Sections 8, 10, 13, 17, and 21) Operator is referred to as "Agent for Reserve" and as acting "for the account and at the expense and risk of Reserve" in reactivating and managing the Plant; but " . . . it is expressly understood that all persons engaged in the performance of this contract by Operator shall be employed or retained by Operator and shall not be the employees of Reserve for any purpose whatsoever." Section 9 (a).

Reserve is to reimburse Operator for costs incurred in the reactivation and management of the Plant and, in addition, is to pay Operator an operating fee as provided in Section 14. We quote the following excerpts from Section 10, which gives examples of such "costs."

"(b) The cost of all facilities, machinery, tools, dies, jigs, office equipment, supplies, manufacturing aids, alterations, improvements, replacements, and additions to the manufacturing buildings or equipment facilities connected therewith, required for the efficient performance of this contract and for which Operator is not otherwise reimbursed; and the cost of all maintenance and repairs including the cost of replacing, repairing or reconditioning any of the machinery or equipment comprising the Plant, damaged or destroyed, but only to the

extent that the damage to or destruction of said machinery or equipment is not covered by insurance and only to the extent that the replacing, repairing or reconditioning is necessary to the efficient operation or maintenance of the Plant.

"It is hereby understood that title to any and all property of whatever character, the cost of which is paid by Reserve pursuant to this subsection (b) of this Section 10, shall vest directly in Reserve, and that title to such property shall in no event vest in Operator.

"  . . .

"It is hereby further understood that in the acquisition, purchase and installation of any machinery, equipment, materials, or supplies in connection with any alterations, improvements or betterments of, or additions to, the Plant, or in connection with any replacements made in the Plant, and in the negotiation, execution and supervision of all contracts with third parties in connection therewith, Operator shall act as Agent for and on behalf of Reserve; provided, however, that as a condition percedent to reimbursement under the terms of this subsection (b) any such expenditure for the acquisition, purchase or installation of machinery, equipment, materials or supplies in connection with any alterations, improvements or betterments of, or additions to, the Plant involving more than One Thousand Dollars ($1,000) shall be first approved in writing by Reserve; and provided, further, that as a condition precedent to reimbursement under the terms of this said subsection (b), any such expenditure for the acquisition, purchase or installation of machinery, equipment, materials or supplies in connection with any replacement in the Plant involving more than Five Thousand Dollars ($5,000) shall be first approved in writing by Reserve.

"(c) The amount of all taxes, licenses, fees or other charges levied by any competent governmental authority, including those levied on the Plant, or for the privilege of operating the Plant, or on the product manufactured therein, or on any materials or supplies, including the amount of any payments made by Operator under the Social Security Act (employer's contribution), and any applicable Federal, state or local taxes, assessments or charges (excluding any taxes on net income, any excess profits taxes, capital stock tax or any other taxes based upon the capital or in-

come of Operator) which Operator may be required to pay to such governmental authority, and which are incurred in connection with the performance of this contract, and including the amount of any additional taxes or contributions required to be paid by Operator at any time during the performance of this contract or within five (5) years thereafter pursuant to the Unemployment Compensation Act of any state and arising out of the layoff or discharge of persons on account of the aforesaid reactivation or intermittent operation of the Plant or termination of this contract.

"(d) The amount of all premiums or other costs of any bonds or insurance, including public liability, employers' liability, property damage, workmen's compensation, fidelity, fire, theft, burglary or other insurance, which Reserve may specifically require Operator to carry under this contract. In the event Reserve and Operator shall cover workmen's compensation risks on a self-insurance basis, such arrangements shall be effectuated in a manner mutually satisfactory to the parties hereto.

"(e) The amount, if any, paid by Operator as damages for any injury to or death of a person or persons, or for any injury to property, the liability for which is incurred by Operator during the term of this contract arising through the occupancy of the Plant, or through the performance of this contract, but such amount, if any, shall be included herein only to the extent that operator is actually out-of-pocket therefor without indemnity of any kind through insurance coverage or otherwise and only to the extent that Operator is legally liable for such damages as determined by due process of law or pursuant to a settlement made with the express approval of Reserve, and provided that the liability of Reserve under this subsection (e) of this Section 10 shall be limited as provided by Section 11."

Section 14, which relates to the operating fee, contains the following statement:

"It is understood that said operating fee is intended to compensate Operator for making available executive management and the knowledge, skill and experience of its organization in connection with the operations to be conducted hereunder, and

also to cover certain expenses incident to the operation and maintenance of the Plant which are not capable of being identified and charged directly hereunder.
. . ."

Section 12 provides for supplying Operator with electric power, gas, water, and compressed air previously contracted for by Reserve. In the event of insufficiency, Operator will receive these utilities as allocated by Reserve. Detailed provisions relate to sewage disposal, track maintenance, cafeteria facilities, pipelines and other facilities.

Section 13 reads, in part, as follows:

"It is understood that in the performance of this contract, Operator is acting as Agent for Reserve, for the account and at the expense and risk of the latter, and that, accordingly, Operator shall in no event be libale for, but shall be held harmless by Reserve against any damage to or loss or destruction of property (whether owned by Reserve or others) or any injury to or death of persons, in any manner, arising out of or in connection with the work hereunder, unless it be shown to have been caused directly by bad faith or wilful misconduct on the part of any officer of Operator or any representative of Operator having supervision and direction of the Plant as a whole, acting within the scope of his authority and employment, or unless it results from the failure of Operator to carry such insurance coverage as Operator may be required to carry under this contract. . . ."

Section 15 provides that Reserve will furnish Operator with working capital to meet Operator's costs, and sets out in detail the procedure to be followed in so doing.

Reserve is to pay Operator monthly the amount of "costs" not otherwise reimbursed, and the amount of the operating fee for the preceding calendar month.

Reserve also contracts to supply Operator with certain materials to manufacture synthetic rubber.

Section 17 contains the following provision:

"Operator, as agent for Reserve, shall use its best efforts to procure all [ other ] materials . . . necessary for the manufacture of Synthetic Rubber

. . . but to the extent Operator is unable to obtain
such materials, Reserve shall endeavor to obtain
such materials and to make arrangements for de-
livery thereof to Operator at the Plant. Title to all
materials purchased by Operator hereunder shall
vest directly in Reserve."

Reserve is to indemnify Operator for any costs in any
way connected with alleged infringement of patent or patent ap-
plications or patent royalty claims "as the result of any action
of Operator hereunder as agent for Reserve, or as the result
of any action taken after the date of commencement of operations
in the Plant by Operator, or by any third party cooperating with
Operator in anticipation of the manufacture of Synthetic Rubber
under this contract; and Reserve shall take all necessary action
(including defense of any suit or suits) and shall bear all costs
and expenses whatsoever (including attorneys' fees) incurred in
connection with the defense, adjustment and payment of any such
claims, demands, causes of action or suits, but Reserve shall
assume no responsibility whatsoever under this Section 18 for any
action not pertinent to the manufacture of Synthetic Rubber under
or in connection with this agreement. . . ."

Technical information acquired in connection with or re-
sulting from the operation of the Plant is to be made freely availa-
ble to Reserve, and Reserve has no obligation to pay for costs of
patents, etc., owned or controlled by Operator.

The Plant is to be operated on a monthly basis with Re-
serve notifying Operator in advance how much rubber Reserve
desires Operator to produce during the coming month.

Section 21 reads as follows:

"All contracts which Operator may execute in con-
nection with the operation or maintenance of the Plant
which run for a period of six (6) months or more, or
which represent an obligation in an aggregate sum of
Five Thousand Dollars ($5,000) or more, shall be sub-
mitted to Reserve for approval prior to execution; pro-
vided, however, that contracts for materials and sup-
plies necessary for the manufacture of Synthetic Rubber
hereunder, unless running for a period of six (6) months
or more or unless containing a provision for liquidated
damages, need not be so submitted to Reserve for ap-
proval, but three conformed copies of all contracts for
such materials and supplies representing an obligation
on the part of Operator, as Agent for Reserve, in an
aggregate sum of Ten Thousand Dollars ($10,000) or

more, shall be forwarded to Reserve immediately
after the execution thereof. All arrangements or
agreements, pursuant to which Operator may itself.
furnish supplies or services to the operation of the
Plant, shall be first submitted to Reserve for ap-
proval prior to execution."

Section 32 reads as follows:

"This contract shall be construed according to
the law of the State of Texas."

The opinions of this office which you cite as controlling
in the instant case may be summarized as follows:

Opinion 0-4389. The Austin Company was constructing
the Fort Worth Aircraft Assembly Plant for the United States.
The government purchased from the distributor the motor fuel
used by the company. Under the terms of the contract, title to
all materials delivered to the site of the work vested in the United
States upon delivery. The company was held to be an independent
contractor. The sale from the distributor to the government was
not taxable but the tax was held to accure when the company ac-
quired and used the motor fuel unless the contractor occupied
some status of immunity or exemption. However, the following
statements appear on pages 9 and 10 of the opinion:

"...If said Austin Company were a mere agent
or instrumentality, under its contract, of the United
States Government, for the construction of the plant
in question, use of motor fuel by said company upon
the highways of this State would be, in contemplation
of law, use of such motor fuel by the Federal Govern-
ment; and no tax would probably accrue, unless such
tax should be considered a toll or charge for use of
property or facilities of the State and therefore col-
lectible even from the Federal Government, a question
not necessary to determine here. If, on the other hand,
The Austin Company is an independent contractor rather
than an agent of the government, its use of the motor
fuel upon the highways would be taxable to the extent
of 4¢ for each and every gallon so used, the same as
such use of motor fuel by any other person, firm or
corporation engaged in business in this State, whether
construction or otherwise...."

Opinion 0-4689 held that an Architect-Engineer-Manager-
cost-plus-a-fixed-fee contractor was not an agency or instrumen-
tality of the Federal Government and was not exempt from payment

of the motor fuel tax. We quote the following excerpt from page 3 of the opinion:

"As stated by the authorities generally (See 39 C.J. 1318-1319) and contrary to the contentions urged by contractor's counsel, there is nothing peculiarly inherent in a contract calling for engineering, architectural or managerial services, as distinguished from 'construction' contracts, which precludes the former type of contract from creating the relationship of independent contractor if the parties so desire to contract. A contract to furnish the architectural, engineering or managerial services for the construction of a given project for the Government is just as necessary and occupies no different classification or status, as relates to the law governing the relationship of master and servant or independent contractor, as the usual contract to actually construct or build the plant or project. Under the instant contract the contractor undertakes and obligates himself or itself to furnish the plans and specifications and to perform all other services expressly contemplated therein, in connection with a specifically described project, and to furnish the labor, materials, tools and supplies therefor, with right of reimbursement by the Government for the cost of the work. . . ."

Opinion 0-4731 dealt with the cement tax levied by Article 7047, V.C.S., and held that since the tax is levied upon the manufacturer and importer of cement it makes no difference to its imposition that such manufacturers and importers thereafter make sales directly to the United States Government or one of its instrumentalities. Alabama v. King and Boozer, 314 U.S. 1 (1941); Curry v. United States, 314 U.S. 14 (1941).

Opinion 0-4214 held that since the Defense Supplies Corporation, a subsidiary of Reconstruction Finance Corporation, was a Federal agency or instrumentality and expressly exempt from sales, use, storage, and purchase taxes by Section 610, 15 U.S.C.A., Texas distributors could sell aviation gasoline tax free to the Corporation. However, the opinion expressly stated:

"Nothing herein should be construed as holding . . . that motor fuel purchased from the . . . Corporation and subsequently sold or used by a 'distributor' is tax exempt."

Opinion 0-5309A reconsidered and affirmed 0-4389. The opinion held (1) that no tax may be imposed on sales to or uses by the Federal government or Federal agencies and instru-

mentalities which Congress has exempt from such tax, (2) that use of motor fuels by a cost-plus contractor with a tax exempt agency is subject to tax, and (3) that the motor fuel tax accrues where motor fuels are both sold to and used by such cost-plus contractors.

The photostat which you have furnished of a purchase order for gasoline directed to the Texas Company shows that it is a purchase order from Reconstruction Finance Corporation acting by and through United States Rubber Company, agent. Shipment is to be made to Reconstruction Finance Corporation, United States Rubber Company, Agent, Port Neches, Texas. Section 8 of the Reconstruction Finance Corporation Act, as amended, 12 U.S.C.A., Sec. 607, expressly provides that the Corporation is exempt "from all taxation ... imposed'. . .by any State . . . except that real property of the Corporation shall be subject to . . . State . . . taxation . . . according to its value as other real property is taxed. The exemptions provided . . . with respect to taxation (which shall, for all purposes, be deemed to include sales, use, storage, and purchase taxes) shall be construed to be applicable not only to the Corporation but also with respect to any other public corporation . . . wholly financed and wholly managed by the Corporation."

In view of the opinions previously summarized, the holdings of which are hereby reaffirmed, sales to the Reconstruction Finance Corporation, acting by and through its agent, United States Rubber Company, are tax exempt. Consistently with other conclusions reached in these opinions, however, we think that the use by U. S. Rubber of the motor fuel on the highways of this State is subject to tax and that U. S. Rubber is liable for the tax.

We have reached this latter conclusion for the following reasons. The contract expressly states that it is to be construed in accordance with the laws of the State of Texas. The fact that the contract designated Operator as "Agent" of Reserve is not controlling. The relationship between the parties to the contract must be determined by all the provisions of the contract itself. 2 Tex. Jur., Agency, §12, p. 394; Falls Rubber Co. v. LaFon, 256 S.W. 577 (Tex. Comm. App. 1923).

Carruth v. Valley Ready-Mix Concrete Co., 221 S.W. 2d 584, 592 (Tex. Civ. App. 1949, error ref. n.r.e.), recognizes as controlling in Texas the following fundamental principles of the Law of Agency:

" 'An independent contractor and an agent are not always easy to distinguish, and there is no uniform criterion by which they may be differentiated. Generally, however, the relations are distinguished

by the extent of the control which the employer ex-
ercises over the employee in the manner in which
he performs his work.

"*              *              *              *

" 'Where a contract contains provisions which,
if they stood alone, would indicate that the true re-
lation was that of independent contractor and others
which indicate that the relationship was that of prin-
cipal and agent, the spirit and essence of the contract,
considered as a whole, must be looked to.

"*              *              *              *

" 'One may be an independent contractor and at
the same time for certain purposes be an agent of
the employer. An independent contractor becomes
an agent by his employer agreeing to be responsi-
ble for obligations incurred by him in the comple-
tion of his undertaking, but payment of workmen
by an owner or employer does not necessarily
transform an independent contractor into an agent.'
2 C.J.S., Agency, §2, pages 1027, 1029."

The first of the last quoted principles has long been
recognized as the law in Texas. In 2 Tex. Jur., Agency, § 10,
p. 390, the rule is stated thus:

"An independent contractor is unlike an agent
in that he is responsible to his employer for the
result only of the work to be done; the employer
has no control over the manner of doing the work
nor any right to select the contractor's employees
or to supervise their work."

In Bertrand v. Mutual Motor Company, 38 S.W. 2d,
417 (Tex. Civ. App. 1931, error ref.), the court said:

"An independent contractor may act for and
in behalf of another, but, since he is not under
the other's control, it is held that the relation of
agency does not exist."

In holding that one of the parties to the contract under
consideration occupied the status of an independent contractor,
the court in Highgrade Lignite Company v. Courson, 219 S.W.
230 (Tex. Civ. App. 1920, error dism.), stated that the following
facts necessitated that conclusion. The party in question had the

exclusive management and control of the leased mine. He had authority over the employees, power to hire and discharge them, and to direct their work. No one told the contractor when to work or how to work. He merely received shipping orders from the other party to the contract, who took all the coal that was mined, paid all operating expenses of every kind or character incident to or connected with the mining operations, and paid the operator of the mine his compensation in fixed monthly sums.

It has also been said that it is the right to interfere in the mode of doing the work contracted for rather than the fact of actual interference with control that makes the difference between a servant or agent and an independent contractor. 56 C.J.S., Master and Servant, § 3(3), pp. 49,54; West Lumber Company v. Powell, 221 S.W. 339, 341 (Tex. Civ. App. 1920, error dism.); Corrigan v. Huebler, 167 S.W. 159, 160 (Tex. Civ. App. 1914).

In the instant case Operator hires and discharges the employees who operate the plant. Operator directs their work. Section 9 of the contract expressly states that persons engaged in the performance of the contract shall not be employees of Reserve for any purpose whatsoever. Reserve has retained no right to interfere in the manner in which the employees perform their work. Sections 8 and 9 require Operator to make all preparations necessary to reactivate the plant and to operate and maintain it; but the choice of such perparations and the method of said operations are nowhere prescribed in the contract but are left to Operator's discretion. Indeed, Reserve's motive for entering into the contract, evidenced throughout the entire instrument and expressly stated in Section 14, was to obtain the benefit of Operator's executive ability and "the knowledge, skill and experience of its organization in connection with the operations to be conducted hereunder." Reserve's interest is clearly limited to results--to obtaining specified amounts of rubber (Secs. 17, 19) and the latest technical developments (Sec. 18).

Thus, under the authorities previously discussed, Operator's relationship to Reserve in the production of synthetic rubber, the operation of pilot plants for experimental purposes, and in its research and developmental work is clearly that of independent contractor. This status is impliedly recognized in Section 10 (c) which lists as an example of the "costs" for which Operator will be reimbursed by Reserve "taxes, licenses, fees or other charges levied . . . for the privilege of operating the Plant, or on the product manufactured therein, or on any materials or supplies, . . . and any applicable Federal, state or local taxes, assessments or charges (excluding any taxes on net income, capital stock tax or any other taxes based upon the capital or income of Operator) which Operator may be required to pay to such governmental

authority, and which are incurred in connection with the perform-
ance of this contract, . . ." Since this section enumerates many
taxes from which Reconstruction Finance Corporation is exempt
under Section 8 of the Reconstruction Finance Corporation Act,
quoted, in part, on page 9 of this Opinion, it negates the proposi-
tion that Operator is Reserve's agent in the performance of the
contract in its entirety. For if such were Operator's true status,
his entire operations would be accorded all of the tax immunity
which has been conferred upon Reconstruction Finance Corpora-
tion.

In so far as the provisions of the contract under con-
sideration deal with the actual production of synthetic rubber
and with Operator's research activities, they are analogous from
both the practical and legal standpoint to the provisions of the con-
tract considered in Att'y Gen. Op. 0-5309A. The existence of an
agency relationship under the submitted contract for certain pur-
poses and the contractual designation of Operator as agent for
Reserve are not sufficient to justify a departure from the holding
of that opinion. You are therefore advised that when Operator
acquires the motor fuel and uses it upon the highways of this
State the motor fuel tax accrues and Operator is liable therefor.

### SUMMARY

Under the terms of the contract between Recon-
struction Finance Corporation and United States Rubber
Company for the operation of a synthetic rubber plant
located near Port Neches, Texas, United States Rubber
Company is made the agent of Reconstruction Finance
Corporation for certain purposes. Sales of motor fuel
to Reconstruction Finance Corporation, acting by and
through its agent, United States Rubber Company, are
not subject to the motor fuel tax levied by Article 7065b-1.
et seq., V.C.S. In the operation of the synthetic rubber
plant and in its research and developmental work under
the contract, United States Rubber Company is an inde-
pendent contractor. Therefore, when United States Rubber
Company acquires motor fuel and uses it upon the high-
ways of this State in the discharge of its contractual obli-
gations, the motor fuel tax accrues and United States Rub-
ber Company is liable therefor.

APPROVED:

W. V. Geppert
Taxation Division

Mary K. Wall
Reviewing Assistant

Charles D. Mathews
First Assistant

Yours very truly,

PRICE DANIEL
Attorney General

By *Marietta McGregor Creel*

Marietta McGregor Creel
Assistant